**FILED - LN**

September 26, 2016 1:38 PM
CLERK OF COURT
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY ___pw_/_____ SCANNED BY ⟋⟋ /9|26|16

**1:16-cv-1178**
**Gordon J Quist**
**US District Judge**

U.S. DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN


MICHAEL KARMOL,

|                | Plaintiff,        | Index No. |
|----------------|-------------------|-----------|

|                | - against –       | **COMPLAINT FOR** |

1. Michigan Unfair Competition Law

2. RICO (18 U.S.C. § 1962(c))

OCWEN LOAN SERVICING, LLC,    3. RICO (18 U.S.C. § 1962(d))

4. Unjust Enrichment

Defendants.    5. Fraud

6. Breach of Contract

------------------------------------------------------

1

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI  48823

517-889-2255, MZXRACER157@AOL.COM

For his complaint of Plaintiff, MICHAEL KARMOL hereby sues the Defendant, Ocwen Loan Servicing, LLC (hereinafter "OLS", "Ocwen" or "Defendant"); demands a jury trial on all issues; and upon information and belief alleges:

## NATURE OF THE ACTION

1.  This case concerns fraudulent practices committed by Ocwen in connection with its home mortgage loan servicing of Plaintiff's mortgage. Taking advantage of the economic downturn and the increasing number of loans in default, Ocwen devised a scheme to deceive Plaintiff into paying, or believing he had to pay, hundreds or thousands of dollars in unlawfully marked-up fees.

2.  Ocwen has used a series of improperly imposed fees, including fraudulently imposed inspection fees. It also uses an enterprise of affiliated companies, including insurance carriers who are wholly owned then spun-off into a separate company -- to engage in its scheme to disguise hidden, marked-up fees so that it could earn additional, undisclosed profits. Through this unlawful enterprise, Ocwen assessed the Plaintiff fees for services performed by vendors, which are unlawfully marked up, often by 100% or more.

3.  More specifically, in order to force the Plaintiff to get behind on his payments, and put

2

him into "default," Ocwen imposed fees and charges that were neither due nor owing, and then obtained a number of default-related services which purportedly are designed to protect the lender's interest in the property. To obtain these services, Ocwen funnels the work through its affiliated companies, like Altisource - who then orders these services using a network of third-party vendors. As a matter of practice, Defendant marks up the third-party vendors' actual cost for their services, and then, passes along the marked-up charge to Ocwen who, without disclosing the mark-up, Ocwen, in turn, assesses the marked-up fees for these default-related service on homeowners (specifically including Plaintiff)' accounts.

4.  Ocwen is well-aware that its marked-up fees, including its inspection fees, violate the disclosures made in homeowners (specifically including Plaintiff)' mortgage contract between the Plaintiff and whoever the current owner and holder of the note and mortgage is, because the fees exceed the actual cost of the default- related services, so when Ocwen collects, or attempts to collect, such fees, it is not merely being "paid back," or collecting "amounts disbursed," nor are such fees "reasonable and appropriate" to protect the note holder's interest in the property and rights under the deed of trust. Nevertheless, through this fraudulent scheme, Ocwen is able to quietly profit from default-related service fees at the expense of distressed homeowners (specifically including Plaintiff) -- a particularly

3

vulnerable class of consumers who are struggling to keep their homes.

5.     Ocwen's fraudulent loan servicing practices are designed to avoid detection, even when examined in bankruptcy proceedings. As one court has explained, "[l]enders have apparently been operating under the assumption that the fees and costs in their proofs of claim are invulnerable to challenge because debtors lack the sophistication, the debtors' bar lacks the financial motivation, and bankruptcy courts lack the time. . . .[T]he Court believes that certain members of the mortgage industry are *intentionally* attempting to game the system by requesting undocumented and potentially excessive fees."1

6.     This type of rampant abuse by mortgage servicers like Ocwen has led federal regulators to enter into numerous consent orders, but according to Mark Pearce, Director, Division of Depositor and Consumer Protection, Federal Deposit Insurance Corporation

these consent orders do not fully identify and remedy past errors in mortgage-servicing operations of large institutions; in fact, the scope of the interagency review did not include a review of . . . the fees charged in the servicing process. Much work remains to identify and correct past errors and to ensure that the servicing process functions effectively, efficiently, and fairly going forward.

7.     In addition to marking up fees for default-related services, Ocwen also has a policy, practice, and procedure of misapplying homeowners (specifically including Plaintiff)'

4

payments, which, in turn, generates fee income and larger profits for Ocwen and its affiliates.

8. Plaintiff brings this action, seeking injunctive relief and damages on behalf of himself and for monetary damages for the conduct of the Defendants, and each of them, who are acting in concert to deceive the Plaintiff and unlawfully take his money for the purpose of profit to Ocwen.

## JURISDICTION AND VENUE

9. Jurisdiction is proper in this Court under 28 U.S.C. § 1332(a)(1). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different states. This Court also has jurisdiction over this matter under 28 U.S.C. §§ 1331, 1961, 1962 and 1964.

10. This Court has personal jurisdiction over Defendants under 18 U.S.C. §1965(a) because Ocwen has recorded an assignment in its name here, and further sent invoices to the Plaintiff here, and collected money unlawfully from the Plaintiff here. In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a

5

common nucleus of operative facts and are such that Plaintiff ordinarily would

expect to try them in one judicial proceeding.

11.    Venue lies within this judicial district under 28 U.S.C. § 1391(b)(1) and (b)(2)

because Defendants' contacts are sufficient to subject them to personal jurisdiction

in this District, and therefore, Defendants reside in this District for purposes of

venue, or under 28 U.S.C. § 1391(b)(2) because certain acts giving rise to the

claims at issue in this Complaint occurred, among other places, in this District.

## PARTIES

12.    This is an action for damages and declaratory relief by MICHAEL KARMOL as resident

and owner of his home located at 4531 DON STREET,  HOLT MICHIGAN 12550,

INGHAM COUNTY (hereinafter referred to as the "subject property") and more fully

described as follows:

**LOT 14, AND THE WEST ½ OF LOT 13, SPAHR SUBDIVISION NO. 1,
TOWNSHIP OF DELHI, INGHAM COUNTY, MICHIGAN, ACCORDING TO
THE RECORDED PLAT THEREOF, AS RECORDED IN LIBER 18 OF PLATS,
PAGE 1, INGHAM COUNTY RECORDS.**

**TAX PARCEL NO: 3305-15-432-007      COMMON ADD: 4531 DON STREET**

6

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

**HOLT, MICHIGAN 48842**

13.    The Plaintiff herein, MICHAEL KARMOL, is a resident of the State of MICHIGAN,
       County of INGHAM. MICHAEL KARMOL resides at 4531 DON STREET, HOLT,
       MICHIGAN, and this is the property which is the subject of this action. Plaintiff's title to
       the above-described subject property is derived from the Warranty Deed from the 20th day
       of June, 1997, from David S. Kramer of the County of INGHAM, to MICHAEL J.
       KARMOL, recorded at Document Number 120231, Liber 2491 Page 1118, in the Public
       Records of INGHAM County, MICHIGAN. A copy of said Warranty Deed is attached as
       Exhibit "A".

14.    The Defendant herein, Ocwen Loan Servicing, LLC is Delaware limited liability
       company, and an indirect wholly-owned subsidiary of Ocwen Financial Corporation.
       Ocwen Loan Servicing, LLC maintains operations in this District related to the activities
       at issue in this case, including operations concerning the management of Plaintiff's loan.
       Ocwen Loan Servicing, LLC's headquarters are located in West Palm Beach, Florida. It is
       licensed to service mortgage loans in all fifty states, including California, the District of
       Columbia, and two U.S. territories; AND HAS DESIGNATED AS ITS AGENT FOR
       SERVICE OF PROCESS, CORPORATION SERVICE COMPANY, 601 ABBOT

7

ROAD, EAST LANSING MI 48823.

15. Ocwen is the purported assignee of the subject MORTGAGE ONLY separating it from the note, as evidenced by Exhibit C, Corporate Assignment of Mortgage, 2016-001754, recorded on 01/15/2016.

16. Whenever, in this Complaint, reference is made to any act, deed, or conduct of Defendants committed in connection with the enterprise, the allegation means that Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees or representatives, each of whom was actively engaged in the management, direction, control or transaction of the ordinary business and affairs of Defendants and the enterprise.

17. Plaintiff is informed and believes, and based thereon, alleges that, at all material times herein, each of the Defendants was the agent, servant, or employee of the other Defendants, and acted within the purpose, scope, and course of said agency, service, or employment, and with the express or implied knowledge, permission, and consent of the other Defendants, and ratified and approved the acts of the other Defendants.

18. Defendants are the ultimate recipient of the ill-gotten gains described herein. The fraudulent scheme at issue in this case was organized by executives working at the

8

highest levels of Defendants' respective companies, and carried out by both executives and subordinate employees working for Defendants.

## FACTS COMMON TO ALL CAUSES OF ACTION

19. Ocwen uses an enterprise of affiliated companies to engage in its scheme to disguise hidden, marked-up fees so that it could earn additional, undisclosed profits.

20. In its loan servicing operations, Ocwen follows a strategy to generate fraudulently concealed default-related fee income. Rather than simply obtain default-related services directly from independent third-party vendors, and charge homeowners (specifically including Plaintiff) for the actual cost of these services, Ocwen has a policy, practice, and procedure of marking up fees for default-related services on homeowners (specifically including Plaintiff)' loan accounts. As a result, even though the mortgage market has collapsed, and more and more borrowers are falling into delinquency, Ocwen continues to earn substantial profits.

21. Ocwen's scheme works as follows: Ocwen directs its third party companies to order and coordinate default-related services, and, in turn, those companies places orders for such services with third-party vendors. The third-party vendors charge Ocwen for the performance of the default-related services, Ocwen then marks up the price of the

9

MICHAEL J. KARMOL

601 ABBOT ROAD EAST LANSING MI 48823

517-889-2255, MZXRACER157@AOL.COM

vendors' services, in numerous instances by 100% or more, before "charging" the services to the Plaintiff. Once Ocwen bills the marked-up fees to homeowners (specifically including Plaintiff), the fraud is complete, and if the homeowner does not pay, Ocwen has concealed the identity of the name of the Lender so the remedies under the contract, including right of reinstatement by payment to the Lender of the amounts actually owed, not fabricated by Ocwen, are stolen by Ocwen, and the agreement breached.

22.     Through this complex arrangement with Ocwen's third party companies, which is intended to disguise the marked-up fees for default-related services, Ocwen effectively side-steps the Plaintiff's protections in the mortgage contract.

23.     The mortgage contract between Plaintiff and Defendant, as attached, consists of two documents: (i) the promissory note (the "Note"); and (ii) the mortgage/security instrument/deed of trust (the "Deed of Trust"). The mortgage contacts serviced by Ocwen are substantially similar because they conform to the standard Fannie Mae form contract. The contract contains certain disclosures describing what is supposed to happen if borrowers default on their loans.

24.     The Deed of Trust discloses to homeowners (specifically including Plaintiff) that, in the

10

event of default, the loan servicer will:

A.  pay for whatever is reasonable or appropriate to protect the note holder's interest in the property and rights under the security instrument, including protecting and/or assessing the value of the property, and securing and/or repairing the property.

(emphasis added.)

B.  The Deed of Trust further discloses that any such "amounts disbursed" by the servicer to a third party shall become additional debt of the homeowner secured by the Deed of Trust and shall bear interest at the Note rate from the date of "disbursement." (emphasis added.)

C.  Additionally, the Note discloses to homeowners (specifically including Plaintiff) that with respect to "Payment of the Note Holder's Costs and Expenses," if there is a default, the homeowner will have to "pay back" costs and expenses incurred in enforcing the Note to the extent not prohibited by applicable law.

25. Thus, the mortgage contract discloses to homeowners (specifically including Plaintiff) that the servicer will pay for default-related services when reasonably necessary, and will be reimbursed or "paid back" by the homeowner for amounts "disbursed." Nowhere is it disclosed to borrowers that the servicer may engage in self-dealing to mark up the actual cost of those services to make a profit. Nevertheless, that is exactly what Ocwen does.

11

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI 48823

517-889-2255, MZXRACER157@AOL.COM

26.  BPOs are a significant category of third party default-related services for which, in furtherance of Ocwen's unlawful enterprise, fees are assessed on homeowners (specifically including Plaintiff)' loan accounts with substantial, undisclosed mark-ups, fraudulently generating revenue in the loan servicing business.

27.  As discussed above, by charging marked-up fees for BPOs, and "inspection fees" Ocwen violates the disclosures made to borrowers. Furthermore, the wrongful nature of the marked-up fees is demonstrated by the fact that Ocwen conceals the marked-up profits assessed on homeowners (specifically including Plaintiff)' loan accounts.

28.  Although Ocwen assesses fees for BPOs on borrowers' accounts in the range of $100 to $109, as of December 2010, under Fannie Mae guidelines, the maximum reimbursable rate for an exterior BPO was $80,35 and in practice, the actual cost was much less. According to the National Association of BPO Professionals, the actual cost of a BPO may be as little as $30.

29.  Ocwen indisputably is aware that the actual cost of a BPO is significantly less than the marked-up fee it assesses to borrowers.

30.  In order to take advantage of this loophole, Ocwen has abused the process and charged millions to others and Plaintiff, and charged Plaintiff per BPO or "Inspection Fee".

12

31.     In fact, Ocwen has a significant amount of experience in the BPO marketplace. Beginning in mid-2000, Ocwen Federal Bank FSB ("Ocwen Bank"), a former wholly-owned subsidiary of OFC, began "selling" marked-up BPOs to Wall Street firms acquiring large pools of underperforming loans.

32.     Ocwen Bank's in-house BPO shop was the subject of the litigation styled *Cartel Asset Management v. Ocwen Financial Corp.*, Case No. 1:01-cv-01644-REB-CBS (D. Colo.) ("Cartel"). In Cartel, Cartel Asset Management, Inc. ("CAM"), a large national BPO vendor, sued OFC, Ocwen Technology XChange, Inc., and Ocwen Bank for theft of CAM's trade secret -- a confidential list of experienced, responsive and competent realtors who produced high-quality BPOs.37 Ocwen Bank facilitated this theft by secretly copying the names and contact information of realtors identified on BPOs that it purchased from CAM, and then embedding the stolen information into its own incomplete database of BPO providers.

33.     In 2004, a jury awarded CAM compensatory and punitive damages.

34.     While the judgment was on appeal, OFC dissolved Ocwen Bank and transferred the database containing the stolen names and contact information to OLS, who continued to use and profit from CAM's trade secret. OLS was added as a defendant in Cartel after the

13

Tenth Circuit remanded for a new trial on damages.

35.    In September 2010, a jury returned a verdict in CAM's favor for more than $13.7 million
       in compensatory and punitive damages based on the theft of the trade secret.

36.    This jury verdict covered the period up through August 10, 2009, the date when OFC
       transferred the BPO product line and the database to its affiliated company Altisource. As
       with OLS before it, Altisource has continued to use and generate profits from CAM's
       trade secret.

37.    Notably, in Cartel, William C. Erbey, OFC's Executive Chairman, offered the following
       testimony, under penalty of perjury, concerning Ocwen Bank's BPO business:

38.    [A]s of 2004, [Ocwen] Bank would pay an agent or broker approximately $45 to $50 to
       provide a BPO and then sell the BPO for a profit. A reviewed BPO would be sold for
       approximately $150 and an unreviewed BPO for approximately $70.41

39.    Despite knowing the actual cost of a BPO is approximately $50, Ocwen routinely and
       repeatedly assesses borrowers BPO fees of $100 or more, representing a 100% mark-up,
       in clear violation of the mortgage contract.

40.    After paying millions for exemplary damages for this practice, Ocwen began billing

14

Plaintiff for multiple inspection fees, sometimes five in a single month, if not more.

41. Ocwen also assessed Plaintiff for services related to the examination of the title to the property securing the loan. These fees typically appeared as a "Title Search" fee, a "Title Report Fee," or fees for "FC Thru Title Searches" on Plaintiffs' monthly statements.

42. Upon information and belief, the title examination fees assessed by Ocwen are significantly marked-up. For example, a title search fee typically ranges between $150 and $450. Nevertheless, Ocwen routinely charged the Plaintiff $829 for a "Title Search."

43. Using its enterprise -- comprised of affiliated companies, like Altisource, and third party "property preservation" vendors -- and its automated mortgage loan management system, Ocwen engaged in a scheme to fraudulently conceal and assess unlawfully marked-up fees for default-related services on homeowners (specifically including Plaintiff)' loan accounts, cheating Plaintiff as well as hundreds of thousands of other borrowers out of hundreds of millions dollars, and cheating Plaintiff out of thousands of dollars, his equity and money for court costs and fees. Furthermore, to conceal its activities and mislead homeowners (specifically including Plaintiff) about the true nature of its actions, Ocwen employed a corporate practice that omits the true nature of the fees that are being assessed on homeowners (specifically including Plaintiff)' loan accounts. These practices are

15

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI 48823

517-889-2255, MZXRACER157@AOL.COM

common to all of Ocwen's files and directly harmed the Plaintiff.

44.    As a result of the practices of Ocwen's unlawful enterprise, hundreds of thousands of
       unsuspecting borrowers are cheated out of millions of dollars and Plaintiff is suffering
       directly from the conduct.

45.    Through this unlawful enterprise, Ocwen assessed the Plaintiff for services performed by
       vendors, which are unlawfully marked up, often by 100% or more.

46.    More specifically, when Ocwen imposed so many charges and fees, they forced the
       Plaintiff to get behind on his payments and go into "default."

47.    Ocwen obtained a number of default-related services which purportedly are designed to
       protect the lender's interest in the property.

48.    To obtain these services, Ocwen funneled the work through its affiliated companies, who
       then ordered these services using a network of third-party vendors and further
       DIRECTLY BILLED THE PLAINTIFF FOR PROPERTY INSPECTION FEES where
       there was NO INSPECTION and no basis for imposing those fees, as well as nothing in
       the contract which permits the imposition of unnecessary property inspection fees.

49.    As a matter of practice, the third party companies retained by Ocwen marked up the third-

16

MICHAEL J. KARMOL

601 ABBOT ROAD    EAST LANSING    MI    48823

517-889-2255, MZXRACER157@AOL.COM

party vendors' actual cost for their services, and then, passes along the marked-up charge to Ocwen.

50. Without disclosing the mark-up, Ocwen, in turn, assesses the marked-up fees for these default-related service on Plaintiffs' accounts.

51. This Court has jurisdiction over this matter under an outstanding claim or encumbrance which, if valid, would affect or impair the title of the owner of a particular estate, and on its face has that effect, but can be shown by extrinsic proof to be invalid or inapplicable to the estate in question. *Best Inv. Co. v. Parkhill*, Tex.Civ.App., 429 S.W.2d 531, 534. A conveyance, mortgage, judgment, tax-levy, etc., may all, in proper cases, constitute a cloud on title. *Newpar Es Estates, Inc. v. Barilla*, 161 N.Y.S.2d 950, 952. The remedy for removing a cloud on title is usually the means of an action to quiet title. According to Exhibit A and Exhibit B, the owner of the subject property, MICHAEL KARMOL, owns the right to bring this action in his sole and separate name.

## Ocwen Misapplies Borrowers' Payments

52. For subprime servicers such as Ocwen, late fees alone constitute a significant fraction of its total income and profit. As a result, Ocwen has an incentive to push Plaintiff into default and keep him there.

17

53. Ocwen accomplished this objective by, *inter alia*, misapplying Plaintiffs' payments, and then cascading his loan account with illicit late fees.

54. These unlawful late fees have forced Plaintiff into default, opening the flood gates for Ocwen to then charge additional late fees and significant charges for defaulted-related services.

55. Over time, these egregious late fees and fees for default-related services totaled up to thousands of dollars, making it nearly impossible for Plaintiff to become current on his loan.

56. Ocwen's method of misapplying payments in order to charge Plaintiff as an innocent borrowers thousands of dollars in fees and charges is a widespread practice.

57. Under the terms of Paragraph 2, "Application of Payments or Proceeds," of the Plaintiff's Deed of Trust contract, there is a hierarchy in which funds from customer payments are to be applied. Specifically, funds are to be applied in the following order: (1) interest due under the promissory note; (2) principal due under the promissory note; (3) amounts due for any "escrow items"; (4) late charges; and (5) fees for default-related services and other amounts. Escrow items are generally defined as taxes or assessments which may take priority over the lender's interest in the property and premiums for insurance a

18

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

homeowner is required to have under the terms of the mortgage contract.

58.    One way Ocwen misapplied Plaintiff's payments was to divert a portion of the interest
       and principal payments made by homeowners (specifically including Plaintiff) who pay
       their own property taxes and maintain proper insurance to "escrow accounts."

59.    An escrow account is an account set up and controlled by a lender on behalf of a
       homeowner to pay these "escrow items." As mentioned above, a homeowners
       (specifically including Plaintiff)' monthly payment cannot be diverted to an escrow
       account until that payment covers, in full, the borrowers interest and principal payment
       due in that given month.

60.    Ocwen not only routinely violated the payment hierarchy contained in Plaintiffs'
       mortgage contract and diverted Plaintiff's payments away from principal and interest on
       the loan.

61.    As a result of this violation, Plaintiff who timely pay his own real estate taxes and
       insurance premiums, was denied the proper interest and principal credits under the loan
       agreement. Ocwen instead diverted a portion of the funds (which end up not being needed
       to pay escrow items) to an escrow account or flat out rejected the payment.

62.    Ocwen's failure to accept or properly credit Plaintiffs' payments to cover, in full, his

19

monthly interest and principal obligations forced Plaintiff into default.

63.  Once in default, Ocwen then made demands that Plaintiff make significant payments, which were riddled with unjust late and default-related service fees.

64.  Additionally, when Ocwen forces homeowners (specifically including Plaintiff) who pay their own property taxes and maintain their own insurance into default by misapplying their payments to an escrow account, these homeowners (specifically including Plaintiff) are denied the ability to access the surplus in their escrow account.

65.  In fact, the Plaintiff went to the County Assessor to pay his own taxes in September. He was told that he COULD NOT PAY HIS TAXES as the servicer, Ocwen, instructed them NOT to let him pay his taxes, and instead wanted their own entity to pay them, forcing Plaintiff to reimburse and pay Ocwens entity.

66.  Under the terms of the loan agreement, Ocwen will refund Plaintiff's surplus escrow funds only when the loan is paid in full.

67.  Ocwen, in essence, is using the escrow account as one way to justify the late and default-related fees it charges homeowners (specifically including Plaintiff).

68.  In addition to the direct monetary damages caused to Plaintiff, in the form of the

20

difference between the actual cost of the services provided and the marked-up fees assessed on Plaintiff's loan account, Plaintiff suffered other, less obvious injuries as a result of the practices described herein.

69. The assessment of these marked-up fees can make it impossible for Plaintiff to become current on his loan.

70. Charges for such default-related services added thousands of dollars to Plaintiffs' loan over time, driving him further into default.

71. When Plaintiff got behind on his mortgage, and fees for these default-related services are stacked on to the past-due principal and interest payments, Ocwen's practices make it increasingly difficult for Plaintiff to ever bring his loan current.

72. Even if Plaintiff pays the delinquent principal and interest payments, the late and default-related service fees ensure that Plaintiff stays in default.

73. Although the next payment comes in on time, through automatic payment deductions from Plaintiffs bank account, part of the payment is applied to the fees first, so there is not enough to cover the entire monthly payment. This makes that payment late, creating a cascade of more fees, and more arrears that keeps homeowners (specifically including Plaintiff) in delinquency. By the time homeowners (specifically including Plaintiff) are

21

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

aware, Ocwen is threatening to foreclose unless a huge payment is made, and the weight of these marked-up fees drops homeowners (specifically including Plaintiff) into a financial abyss.

74. Additionally, as a result of Ocwen's practices, which force homeowners (specifically including Plaintiff) to move deeper into default, homeowners (specifically including Plaintiff) are driven into foreclosure.

75. During the course of the conduct complained of herein, the Defendants acted on behalf of the remaining Defendants, with the consent of the other Defendants, and subject to their control. Defendant ratified the conduct of the other Defendant.

76. Defendants co-conspired to commit the acts complained of herein.

77. Plaintiff is the owner of the property claimed or is entitled to possession of the REAL AND PERSONAL property because Plaintiff is the purchaser and owner of the real property and owner of all personal property contained therein, Exhibit A.

78. Plaintiff's interest in such property is based upon a written instrument.

79. Ocwen took over the servicing of Plaintiff 's mortgage.

80. Ocwen misapplied Plaintiff's principal and interest payment to an escrow account

22

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

established after Plaintiff's property taxes were paid 2014.

81. Plaintiff fully reimbursed Ocwen in early 2014 for the property taxes it paid.

82. He also paid a $400 escrow fee.

83. Following this incident, Plaintiff had telephone conversations with Ocwen staff where he arranged that he would pay his own property taxes going forward.

84. Plaintiff promised to provide timely proof of said payments.

85. Since making this arrangement, Plaintiff has attempted to pay his own taxes, only to be rebuffed by the County Assessor, saying that Ocwen prevents that. He wanted to pay them in full all property taxes associated with his property and has maintained the proper insurance required by his mortgage contract.

86. Plaintiff also has always provided Ocwen with timely notice of his property tax payments.

87. Notwithstanding Plaintiff's timely property tax and insurance premium payments, Ocwen charges Plaintiff a fee of $600 per year for maintaining an escrow account, and it has failed to properly apply his interest and principal payments to his loan. Instead, Ocwen has diverted funds to his escrow account. Although Ocwen has never once used it to pay property taxes or insurance, and Plaintiffs escrow account had a positive balance.

23

MICHAEL J. KARMOL

601 ABBOT ROAD EAST LANSING MI 48823

517-889-2255, MZXRACER157@AOL.COM

88. More recently, Ocwen has flat out rejected Plaintiff interest and principal payments on the basis that they are not sufficient to satisfy the defaulted amount on the loan, i.e., interest and principal plus escrow fees.

89. Ocwen further imposed multiple inspection fees, sometimes five in a few months.

90. By diverting a portion of Plaintiff's interest and principal payments to an escrow account, Ocwen has failed to properly credit Plaintiffs' account.

91. Ocwen's failure to properly credit Plaintiff's interest and principal payments has burdened his account with unscrupulous fees and has forced his loan into default.

92. Plaintiff not only has been denied the right to have his payments applied correctly to his loan account, but he has also been unable to claim interest deductions on his federal and state tax returns, refinance his loan, has been subjected to harassing telephone calls, and has been under the constant fear of imminent foreclosure.

93. Because Ocwen has forced his loan into default, Plaintiff has been denied access to the surplus in his escrow account.

94. Ocwen also continually assessed marked-up fees for default-related services on the mortgage account of Plaintiff, thereby subjecting him to an invalid debt.

24

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI  48823

517-889-2255, MZXRACER157@AOL.COM

95. Ocwen assessed the improper fees on the following dates, among others according to proof at the time of trial.

a. From the time Ocwen took over the servicing, Ocwen started to charge, and continues to charge, BPO FEES, Property Inspection fees and other late charges and interest, which raised the loan on our homestead house by more than $75,000, making a home whose current fair market value has been artificially depressed by their conduct to approximately $115,000, while imposing a loan of almost double that.

b. Ocwen has imposed fees and charges in excess of the jurisdiction of this court of $75,000 and those amounts were neither due nor owing.

96. Ocwen also charged Plaintiff a series of title report, title search, and other default-related service fees that are either not legally due under the mortgage contract and applicable law, or that are in excess of amounts legally due.

97. Ocwen assessed multiple "Title Search" fees on the Plaintiff's account when, no inspection actually occurred, making the charges fraudulent and false, and a felony.

98. Ocwen alone maintains a complete accounting of all fees assessed and paid, and the details of each and every fee assessed and paid cannot be alleged with complete precision without access to Ocwen's records. Nevertheless, Plaintiff is informed and believes, and

25

MICHAEL J. KARMOL

601 ABBOT ROAD    EAST LANSING   MI  48823

517-889-2255, MZXRACER157@AOL.COM

on that basis alleges, that he paid some or all of the unlawful fees assessed on his account.

99.     The Plaintiff, MICHAEL KARMOL hereby sues the Defendant Ocwen; and alleges:

## FIRST CAUSE OF ACTION

(Violation of the MICHIGAN Unfair Competition Law

MICHIGAN CONSUMER PROTECTION ACT 445.903 Unfair, unconscionable, or deceptive methods, acts, or practices in conduct of trade or commerce; rules; applicability of subsection (1)(hh).)

100.    Plaintiff incorporates the facts common to all causes of action, paragraphs 1 – 98, herein, as though set forth in full.

101.    In relevant part, the Michigan Consumer Protection Act prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce." Mich. Comp. Laws § 445.903(1).

102.    The modern view as to the law of unfair competition does not rest solely on the ground of direct competitive injury, but on the broader principle that property rights of commercial value are to be and will be protected from any form of unfair invasion or infringement and from any form of commercial immorality, and a court of equity will penetrate and restrain every guise resorted to by the wrong-doer. The courts have thus recognized that

26

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI   48823

517-889-2255, MZXRACER157@AOL.COM

in the complex pattern of modern business relationships, persons in theoretically noncompetitive fields may, by unethical business practices, inflict as severe and reprehensible injuries upon others as can direct competitors. That defendants' piratical conduct and practices have injured and will continue to injure plaintiff. *The Act defines "trade or commerce" as "the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes and includes the advertising, solicitation, offering for sale or rent, sale, lease, or distribution of a service or property, tangible or intangible, real, personal, or mixed, or any other article, or a business opportunity." Id. § 445.902(g) (emphasis added). FOREWORD MAGAZINE, INC. v. OVERDRIVE, INC.,* Dist. Court, WD Michigan 2013, No. 1:10-cv-01144..

103. The Defendant Ocwen used improper billing practices as a loan servicer for the purpose of interfering with the mortgage agreement between the Plaintiff and the Lender, whoever that was at the various times during the improper practices.

104. Ocwen concealed the identity of the Lender to prevent the Plaintiff from exercising his rights of redemption under the contract (Paragraphs , and then imposed improper and unwarranted fees and expenses for the purpose of selfish profit, to cause a default, and in turn, make more money by imposing default fees.

27

105.    As further evidence of the misconduct of the Defendant, Ocwen separated the note from
        the mortgage so it could conceal the identity of the lender.

106.    On May 20th, 2004, at Document Number 2004-032000, Liber 3109, Page 491, recorded
        in the official records of INGHAM MI (Exhibit B), Plaintiff refinanced the property in the
        sum of $116,471.00.

107.    On May 20th, 2004, at Document Number 2004-032000, Liber 3109, Page 491, recorded
        in the official records of INGHAM MI (Exhibit B), Plaintiff refinanced the property in the
        sum of $116,471.00.

108.    There exists a contractual agreement between Plaintiff and Defendant OCWEN as
        purported successor to GMAC MORTGAGE CORPORATION (Exhibit B).

109.    That implied in that Agreement are the covenants of good faith and fair dealing.

110.    That contained in that Agreement, pursuant to Paragraph 2 of the Agreement, the
        "Lender" owes the Plaintiff certain duties, including the ability to collect Escrow Items in
        an amount not to exceed the maximum amount that may be required for Borrower's
        escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C.
        Section 2601 *et. seq*. and implementing regulations, 24 CFR Part 3500, as they may be
        amended from time to time ("RESPA"), et seq. Exhibit B.

28

111.   That contained in the next paragraph of Exhibit B, if the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA. Et seq. Exhibit B.

112.   That the Lender further owes the duties under Paragraph 3, an order of how to apply payments. Exhibit B.

113.   That under Paragraph 4, notice requirements are to the Lender, not to any servicer or other entity. Exhibit B.

114.   That under Paragraph 5, notice requirements are to the Lender, not to any servicer or other entity. Exhibit B.

115.   That under Paragraph 6, the Lender holds duties on application of proceeds to the Plaintiff. Exhibit B.

116.   That under Paragraph 7, the rights and duties of the Lender in the property are clearly set forth. Exhibit B.

117.   That under Paragraph 8, the Lender may collect fees and charges. Exhibit B.

118.   Paragraph 10 gives the Lender the right of reinstatement by payment to the Lender.

29

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI  48823

517-889-2255, MZXRACER157@AOL.COM

119. Paragraph 13 related to notices requires the Plaintiff give notice to the Lender at the address provided by the Lender. No mention of Servicer is made. Exhibit B.

120. Similar notice requirements to the Lender by the Plaintiff are contained in Paragraph 16. Exhibit B.

121. That pursuant to Paragraph 18, only the Lender may invoke the power of sale and any other remedies permitted by applicable law. Exhibit B.

122. That Defendant, by use of MERS and a chain of loan servicers, have concealed from the Plaintiff the name, address and identity of the Lender.

123. That in concealing the identity of the Lender, the Defendant has prevented the Plaintiff from performing under the contract.

124. The Plaintiff has performed all conditions, obligations and duties under the contract except those the Defendant has prevented the Plaintiff from performing by concealing the identity of the real Lender, including the address of the lender where payments and any right of redemption under Exhibit B.

125. That by concealing the identity, whereabouts, address and information about the Lender, the Defendant not only interfered actually and proximately causing a breach of the

30

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI   48823

517-889-2255. MZXRACER157@AOL.COM

agreement between the Plaintiff and Defendant, but also breached the implied covenants of good faith and fair dealing, as concealing the identity of the Lender deprives the Plaintiff of his rights and duties owed him by the Lender, and prevents the Plaintiff from performing his obligations to the Lender.

126. Until the identity of the Lender is provided, and it can be determined that the Lender is a bona fide purchaser for value, and lawfully entitled to enforce Exhibit B, the Plaintiff prays for an order finding that Plaintiff is in breach and further as a result, find that the contract is no longer enforceable by this concealment.

127. That, in so doing, the Defendant is not the Lender, and by refusing to provide the current true identity of the lender, have committed acts of impersonation (purporting to be the Lender when they have sold or transferred all interest in the subject property), fraud, deception, and misrepresentation holding themselves out as Lender and then placing false charges on the Plaintiffs accounts.

128. That the Plaintiff is informed, believes and thereon alleges that the Defendant does not have a license to act as a debt collector and is therefore acting in Michigan as an unlicensed Debt Collectors as two Michigan statutes governing debt collection, MCL §339.901 *et seq*. and MCL §445.251 *et seq*. closely mirror their federal counterpart, the

31

Fair Debt Collection Practices Act, 15 U.S.C. §§1692-1692p, in both substance and application.

129. Michigan Statute Section 500.2005a Unfair method of competition; unfair or deceptive act or practice, Section 2005a, defines "An unfair method of competition and an unfair or deceptive act or practice in the business of insurance includes all of the following: (a) Knowingly making any misleading representation or incomplete or fraudulent comparison of any insurance policies, certificates, or contracts of insurers, health care corporations, or health maintenance organizations for the purpose of inducing, or tending to induce, any person to lapse, forfeit, surrender, terminate, retain, pledge, assign, borrow on, or convert any insurance policy, certificate, or contract or to take out a policy, certificate, or contract with another insurer, health care corporation, or health maintenance organization.

130. That the purpose of the Act is to prohibit the practices so defined. See 500.2002 Purpose of act, Sec. 2002.

131. That July 24th, 2009, but that assignment does NOT INCLUDE THE ASSIGNMENT OF THE NOTE.

132. The note cannot be separated from the mortgage, and by this assignment, the note was so separated. See Exhibit C.

32

MICHAEL J. KARMOL

601 ABBOT ROAD EAST LANSING MI 48823

517-889-2255, MZXRACER157@AOL.COM

133. In so doing, the note and mortgage are both void and unenforceable. See US Supreme Court Case The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity. *Jackson v. Blodget*, 5 Cowan, 205; *Jackson v. Willard*, 4 Johnson, *CARPENTER v. LONGAN*, 83 U.S. 271 (16 Wall. 271, 21 L.Ed. 313).

134. Because the note was separated from the mortgage, the mortgage became a nullity, but Ocwen collected money nonetheless.

135. Ocwen also imposed monthly fees of $20 for property inspection and other false fees on the Plaintiff's account to put him into arrears, or, in the alternative, simply to collect the money.

136. Ocwen used Mers as a means of concealing assets in violation of the MICHIGAN Fraudulent Transfer and Concealment Act, and thus the Plaintiff seeks an equitable order declaring that Exhibit C constitutes a cloud on the title of the Plaintiff and that it must be removed, deemed void ab initio, unenforceable and find that OCWEN and its predecessors, as well as its successors and assigns be forever barred from enforcement of the void note and mortgage.

137. What's more, Ocwen conspired to have fabricated and recorded AN ASSIGNMENT OF

33

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING MI 48823

517-889-2255, MZXRACER157@AOL.COM

MORTGAGE ONLY, SEPARATING IT FROM THE NOTE.

138. The purported transfer of the void MORTGAGE occurred, but that assignment does NOT INCLUDE THE ASSIGNMENT OF THE NOTE. The note cannot be separated from the mortgage, and by this assignment, the note was so separated. See Exhibit C. In so doing, the note and mortgage are both void and unenforceable. The note and mortgage are inseparable; the former as essential, the latter as an incident. An assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity. *Jackson v. Blodget*, 5 Cowan, 205; *Jackson v. Willard*, 4 Johnson, *CARPENTER v. LONGAN*, 83 U.S. 271 (16 Wall. 271, 21 L.Ed. 313).

139. Furthermore, the Note and mortgage and all assignments thereon constitute a predatory loan created by Defendants predecessor in interest GMAC to drive the value of the property owned by the Plaintiff down; to entice the Plaintiff to enter into a loan agreement it knew, or reasonably should have known, was harmful and "toxic" to the Plaintiff; and was done for the purpose of taking undue advantage of the Plaintiff where the Plaintiff had unequal bargaining position with the Defendant.

140. Furthermore, by means of the securitization and transfer of the mortgage without the note, the Plaintiff has been forced to pay late charges, imposition of fees and costs, and pay

34

invoices that were not due to the Defendant or their predecessors in interest.

141. As a result, each invoice sent to the Plaintiff, each bill he paid, or received, constitutes a separate violation of the Fair Debt Collection Practices Act as fraudulent, and there were more than 100 separate statements, bills, letters and calls, with the amount Defendant is obligated to pay the Plaintiff of $1,500 for each statement, letter and recorded document.

142. Equity dictates that the toxic loan be deemed void ab initio and unenforceable in violation of the MICHIGAN consumer protection laws.

143. In the course and conduct of their loan servicing and collection, Ocwen knowingly, affirmatively, and actively concealed the true character, quality, and nature of their assessment of marked-up default-related service fees against Plaintiffs' accounts.

144. Relying on Ocwen, Plaintiff believed they were obligated to pay the amounts specified in Ocwen's communications.

145. In truth and in fact, Plaintiff was not obligated to pay the amounts that have been specified in Ocwen's communications concerning default-related services, including BPOs and title searches.

146. Ocwen disguised the fact that the amounts they represent as being owed have been

35

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

marked-up beyond the actual cost of the services, violating the disclosures in the mortgage contract.

147. Contrary to Ocwen's communications, they are not legally authorized to assess and collect these marked-up fees.

148. Ocwen's knowing, affirmative, and active concealment, as set forth herein, constitutes an "unlawful" practice because it violates Title 18 United States Code sections 1341, 1343, and 1962, as well as the State Statutes mentioned above, and the common law.

149. Ocwen's practice of misapplying Plaintiffs payment, thereby breaching plaintiffs' mortgage contract, also constitutes an "unlawful" practice in violation of the State Code.

150. Ocwen's knowing, affirmative, and active concealment, as set forth herein, also constitute "unfair" business acts and practices within the meaning of the Statute in that Ocwen's conduct was injurious to consumers, offended public policy, and was unethical and unscrupulous.

151. Plaintiff also asserts a violation of public policy by concealing material facts from consumers. Ocwen's violation of this States consumer protection and unfair competition laws in MICHIGAN resulted in harm to consumers and Plaintiff directly.

36

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI 48823

517-889-2255, MZXRACER157@AOL.COM

152. There were reasonable alternatives available to Ocwen to further their legitimate business interests, other than the conduct described herein.

153. State Statutes also prohibits any "fraudulent business act or practice." Ocwen's concealment of material facts, as set forth above, was false, misleading, or likely to deceive the public within the meaning of the statutes. Ocwen's concealment was made with knowledge of its effect, and was done to induce Plaintiff to pay the marked-up default related service fees.

154. Plaintiff relied on his reasonable expectation that Ocwen would comply with the disclosures set forth in the mortgage agreement, Notes, and Deeds of Trust, and as a result, Plaintiff relied on Ocwen's disclosures about the fees on their statements, reasonably believing the default-related service fees to be valid charges that were not marked-up. Indeed, to lull Plaintiff into a false sense of trust and dissuade him from challenging Ocwen's unlawful fee assessment, Ocwen concealed their scheme from Plaintiff by telling him, in statements and other documents, that such fees are in accordance with the terms of their mortgage. Had the true nature of the fees been disclosed to Plaintiff, he would have been aware of the mark-ups and Plaintiff would have disputed the charges and not paid them.

37

MICHAEL J. KARMOL

601 ABBOT ROAD EAST LANSING MI 48823

517-889-2255, MZXRACER157@AOL.COM

155.  Plaintiff has been injured in fact and suffered a loss of money or property as a result of
      Ocwen's fraudulent, unlawful, and unfair business practices. Plaintiff would not have
      paid Ocwen's unlawful fees or they would have challenged the assessment of such fees
      on their accounts had it not been for Ocwen's concealment of material facts.

156.  Ocwen has thus engaged in unlawful, unfair, and fraudulent business acts entitling
      Plaintiff to judgment and equitable relief against Ocwen, as set forth in the Prayer for
      Relief.

157.  Additionally, Plaintiff seeks an order requiring Ocwen to immediately cease such acts of
      unlawful, unfair, and fraudulent business practices, and requiring Ocwen to correct its
      actions.

158.  Further, because of the fraud perpetrated by the Defendants, and each of them, the
      Mortgage and the note secured thereon, are void ab initio, fraudulent, and should be
      deemed illegal and unenforceable; as the Defendant committed acts of bank fraud, mail
      fraud, wire fraud, deception and conspiracy in their operation and handling of the
      Plaintiffs and others loans; that Plaintiffs and others detrimentally and justifiably relied
      on the conduct and representations of the Defendants; and in so doing Plaintiffs were
      irreparably harmed; and Plaintiff suffered emotional distress, damage to her credit;

38

aggravation, pain and suffering in the amount of one million dollars, in the event of default, or according to proof.

159. The Mortgage and assignments thereon remains unsatisfied of record and constitutes a cloud on Plaintiffs' title to the property.

160. As a result of their unethical business practices, Ocwen has inflicted severe and reprehensible injuries upon Plaintiff, and others in the housing industry. Ocwen has negatively impacted the market value of the Plaintiff and other homeowner's properties as a result of fraudulent foreclosures that artificially depress the value of the market.

161. That defendant Ocwens' piratical conduct and practices have injured and will continue to injure plaintiff. *METRO. OPERA v. Wagner-Nichols R. Corp.*, 199 Misc. 786 - NY: Supreme Court 1950.

162. WHEREFORE, Plaintiffs request the Court order the Defendant Ocwen pay the Plaintiff compensatory damages in the sum of $1,500 for each separate demand, call, letter, and filed document which was recorded in the official records of this county, of no less than 100 separate events, in the sum of $1,500,000; compensatory damages for the emotional distress and trauma caused by their illicit conduct in the sum of three million dollars; and for an order striking from the official records of this County any and all documents where

39

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

Ocwen has or had an interest as fraudulent and void as they split the note from the mortgage and are unsigned; and for exemplary damages of three times the amount, or nine million dollars for Violation of the MICHIGAN Unfair Competition Law; for costs of suit, and such other and further relief as the court deems just and adequate.

## SECOND CAUSE OF ACTION

**(Violations of the Racketeer Influenced and Corrupt Organizations Act)**

**(18 U.S.C. § 1962(c))**

163. Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs (1 – 162, Inclusive), with the same force and effect as though fully set forth herein.

## THE ENTERPRISE

164. Defendant Ocwen is a "person" within the meaning of Title 18 United States Code section 1961(3).

165. At all relevant times, in violation of Title 18 United States Code section 1962(c), Ocwen, including their directors, employees, and agents, along with their sub-contractors and employees, and Ocwen's property preservation vendors conducted the affairs of an

40

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI 48823

517-889-2255, MZXRACER157@AOL.COM

pjg

associated-in-fact enterprise, as that term is defined in Title 18 United States Code section 1961(4) (the "Ocwen Enterprise"). The affairs of the Ocwen Enterprise affected interstate commerce through a pattern of racketeering activity.

166.    The Ocwen Enterprise is an ongoing, continuing group or unit of persons and entities associated together for the common purpose of limiting costs and maximizing profits by fraudulently concealing assessments for unlawfully marked-up fees for default-related services on homeowners (specifically including Plaintiff)' loan accounts.

167.    While the members of the Ocwen Enterprise participate in and are part of the enterprise, they also have an existence separate and distinct from the enterprise. The Ocwen Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Ocwen, their sub-entities, and the vendors that perform the default-related services.

168.    Operating the Ocwen Enterprise according to policies and procedures developed and established by its executives, Ocwen controls and directs the affairs of the Ocwen Enterprise and uses the other members of the Ocwen Enterprise as instrumentalities to carry out Ocwen's fraudulent scheme.

169.    These policies and procedures established by Ocwen's executives include: funneling

41

default-related services through its affiliated companies, to disguise unlawful mark-ups of services provided by third parties; providing statements that conceal the true nature of the marked-up default related service fees; using mortgage loan management software designed to assess undisclosed marked-up fees on borrowers accounts; and failing to provide borrowers with accurate documentation to support of fees for BPOs and "inspection fees".

170.   By developing and implementing policies and procedures leading to the repeated, and unlawful, assessment of marked-up fees for default-related services, Ocwen engaged in the conduct of the Ocwen Enterprise distinct from Ocwen's own affairs as a loan servicer.

## THE PREDICATE ACTS

171.   The Ocwen Enterprise's systematic scheme to fraudulently conceal unlawfully marked-up third party fees on the mortgage accounts of homeowners (specifically including Plaintiff) who have mortgage loans administered by Ocwen, as described above, was facilitated by the use of the United States Mail and wire. The Ocwen Enterprise's scheme constitutes "racketeering activity" within the meaning of Title 18 United States Code section 1961(1), as acts of mail and wire fraud, under Title 18 United States Code sections 1341 and 1343.

42

172. In violation of Title 18 United States Code sections 1341 and 1343, the Ocwen Enterprise utilized the mail and wire in furtherance of their scheme to defraud borrowers whose loans are serviced by Ocwen by obtaining money from borrowers using false or fraudulent pretenses.

173. Through the mail and wire, the Ocwen Enterprise provided mortgage invoices, loan statements, payoff demands, or proofs of claims to homeowners (specifically including Plaintiff), affirmatively demanding that homeowners (specifically including Plaintiff) pay marked-up fees for default-related services. Defendants also accepted payments and engaged in other correspondence in furtherance of their scheme through the mail and wire.

174. The Ocwen Enterprise fraudulently and unlawfully assessed marked-up default-related service fees in violation of the disclosures made in homeowners (specifically including Plaintiff)' mortgage agreements.

175. Furthermore, to lull homeowners (specifically including Plaintiff) into a sense of trust and dissuade them from challenging Ocwen's unlawful fee assessment, Ocwen concealed their scheme from borrowers by telling them, in statements and other documents, that such fees are in accordance with the terms of their mortgage.

43

176. The mortgage invoices, loan statements, or proofs of claims provided to Plaintiff disguised the fact that the default-related service fees assessed on Plaintiffs' accounts were marked-up. By disguising the true nature of amounts purportedly owed in communications to borrowers, the Ocwen Enterprise made false statements using the Internet, telephone, facsimile, United States mail, and other interstate commercial carriers.

177. This fraudulent concealment was material to Plaintiff. Had the Ocwen Enterprise disclosed the true nature of the fees for default-related services, Plaintiff would have been aware of the mark-up, and would have challenged Ocwen's unlawful fee assessments or would not have paid them.

178. Each of these acts constituted an act of mail fraud for purposes of Title 18 United States Code section 1341.

179. Additionally, using the Internet, telephone, and facsimile transmissions to fraudulently communicate false information about these fees to borrowers, to pursue and achieve their fraudulent scheme, the Ocwen Enterprise engaged in repeated acts of wire fraud in violation of Title 18 United States Code section 1343.

180. The Ocwen Enterprise's knowledge that its activities were fraudulent and unlawful is

44

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI  48823

517-889-2255, MZXRACER157@AOL.COM

evidenced by, among other things, the fact that they concealed the marked-up nature of the default-related service fees in their communications to borrowers.

181. The predicate acts specified above constitute a "pattern of racketeering activity" within the meaning of Title 18 United States Code section 1961(5) in which the Ocwen Enterprise have engaged under Title 18 United States Code section 1962(c).

182. All of the predicate acts of racketeering activity described herein are part of the nexus of the affairs and functions of the Ocwen Enterprise racketeering enterprise. The racketeering acts committed by the Ocwen Enterprise employed a similar method, were related, with a similar purpose, and they involved similar participants, with a similar impact on the Plaintiff and other customers of Ocwen.

183. The predicate acts have occurred within the last six months and thus fall within the purview of this Court.

184. Plaintiff hereby pleads that there are numerous acts of mail and wire fraud that were used to carry out the scheme, including the sending of monthly statements which contained the fraudulently imposed statements, the most recent of which was sent and received this month, and Ocwen Enterprise's detailed use of the mail and wire system evidence further exists in Ocwen Enterprise's own records.

MICHAEL J. KARMOL

601 ABBOT ROAD EAST LANSING MI 48823

517-889-2255, MZXRACER157@AOL.COM

185.    The pattern of racketeering activity is currently ongoing and open-ended, and threatens to continue indefinitely unless this Court enjoins the racketeering activity.

186.    Numerous schemes have been completed involving repeated unlawful conduct that by its nature, projects into the future with a threat of repetition.

187.    As a direct and proximate result of these violations of Title 18 United States Code sections 1962(c) and (d), Plaintiff has suffered substantial damages. Members of the Ocwen Enterprise are liable to Plaintiff for treble damages, together with all costs of this action, plus reasonable attorney's fees, as provided under Title 18 United States Code section 1964(c).

188.    WHEREFORE, Plaintiffs request the Court order the Defendant Ocwen pay the Plaintiff compensatory damages in the sum of $1,500 for each separate demand, call, letter, and filed document which was recorded in the official records of this county, of no less than 100 separate events, in the sum of $1,500,000; compensatory damages for the emotional distress and trauma caused by their illicit conduct in the sum of three million dollars; and for an order striking from the official records of this County any and all documents where Ocwen has or had an interest as fraudulent and void as they split the note from the mortgage and are unsigned; and for exemplary damages of three times the amount, or

46

nine million dollars for Violation of the RICO ACT and the MICHIGAN Unfair Competition Law; for costs of suit, and such other and further relief as the court deems just and adequate.

## THIRD CAUSE OF ACTION

(Violation of the Racketeer Influenced and Corrupt Organizations Act)

Conspiracy to Violate Title 18 United States Code section 1962(c))

((18 U.S.C. § 1962(d))

189.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

190.   Plaintiff brings this cause of action on behalf of himself.

191.   As set forth above, in violation of Title 18 United States Code section 1962(d), Defendants conspired to violate the provisions of Title 18 United States Code section 1962(c).

192.   As set forth above, Ocwen, having directed and controlled the affairs of the Ocwen Enterprise, was aware of the nature and scope of the enterprise's unlawful scheme, and they agreed to participate in it.

47

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

193. As a direct and proximate result, Plaintiff has been injured in their business or property by the predicate acts which make up the Ocwen Enterprise's patterns of racketeering activity in that marked-up fees for default-related services were assessed on their mortgage accounts.

194. WHEREFORE, Plaintiffs request the Court order the Defendant Ocwen pay the Plaintiff compensatory damages in the sum of $1,500 for each separate demand, call, letter, and filed document which was recorded in the official records of this county, of no less than 100 separate events, in the sum of $1,500,000; compensatory damages for the emotional distress and trauma caused by their illicit conduct in the sum of three million dollars; and for an order striking from the official records of this County any and all documents where Ocwen has or had an interest as fraudulent and void as they split the note from the mortgage and are unsigned; and for exemplary damages of three times the amount, or nine million dollars for Violation of the MICHIGAN Unfair Competition Law; for costs of suit, and such other and further relief as the court deems just and adequate.

## **FOURTH CAUSE OF ACTION**

Violations of the Fair Debt Collection Practices Act

(15 U.S.C. § 1692, et seq.)

48

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

195. Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

196. Defendants are "debt collectors" within the meaning of the code, because Defendants sent mortgage bills AND past due mortgage statements to Plaintiff, Plaintiff made their mortgage payments to Defendants, Defendants accepted those payments, and Defendants made demands for payment, including the payment of marked-up fees for default-related services, by sending letters, making telephone calls, and other attempts to collect mortgage payments and fees.

197. The marked-up fees for default-related services purportedly owed by Plaintiff are a "debt" within the meaning of the statute, because they are "money, property or their equivalent which [are] due or owing or alleged to be due or owing from a natural person to another person."

198. As alleged herein, and as set forth in detail above, Defendants have committed violations of the State and Federal Fair Debt Collection Practices Act, ("FDCPA"), (the State Statute incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act ("FDCPA")), 15 U.S.C. § 1692.

199. The FDCPA and, therefore, the state statute prohibits a debt collector from using "any

49

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI 48823

517-889-2255, MZXRACER157@AOL.COM

false, deceptive, or misleading representation or means in connection with the collection of any debt." 15 U.S.C. § 1692e.

200. Defendants knowingly, affirmatively, and actively concealed and suppressed material facts, namely the fact that Defendants assessed borrowers' accounts for marked-up default-related services. Contrary to Ocwen's communications, they are not legally authorized to assess and collect these marked-up fees.

201. Pursuant to State and Federal Law, Plaintiff is entitled to recover actual damages sustained as a result of Defendants' violations of the FDCPA. Such damages include, without limitation, monetary losses and damages. Additionally, because Defendants' violations of the FDCPA were committed willingly and knowingly, Plaintiff is entitled to recover penalties of up to $1,500 per violation as provided for in the FDCPA.

202. WHEREFORE, Plaintiffs request the Court order the Defendant Ocwen pay the Plaintiff compensatory damages in the sum of $1,500 for each separate demand, call, letter, and filed document which was recorded in the official records of this county, of no less than 100 separate events, in the sum of $1,500,000; compensatory damages for the emotional distress and trauma caused by their illicit conduct in the sum of three million dollars; and for an order striking from the official records of this County any and all documents where

50

MICHAEL J. KARMOL

60I ABBOT ROAD   EAST LANSING  MI 48823

517-889-2255, MZXRACER157@AOL.COM

Ocwen has or had an interest as fraudulent and void as they split the note from the mortgage and are unsigned; and for exemplary damages of three times the amount, or nine million dollars for Violation of the MICHIGAN and Federal Fair Debt Collection Practices Act; for costs of suit, and such other and further relief as the court deems just and adequate.

## FIFTH CAUSE OF ACTION

### Unjust Enrichment

203. Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

204. By their wrongful acts and omissions of material facts, Ocwen was unjustly enriched at the expense of Plaintiff.

205. The mortgage contract attached hereto and incorporated herein, with Plaintiff discloses that Ocwen will pay for default-related services when necessary, and they will be reimbursed by the homeowner. Nowhere in the mortgage contract is it disclosed that Ocwen may mark-up the actual cost of those services to make a profit.

206. Nevertheless, Ocwen marked-up the prices charged by vendors, often by 100% or more,

51

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI 48823

517-889-2255, MZXRACER157@AOL.COM

and then, assessed the Plaintiff's account for the higher, marked-up fee so that Ocwen can earn a profit.

207. Furthermore, to lull Plaintiff into a sense of trust and dissuade him from challenging Ocwen's unlawful fee assessment, Ocwen further concealed their scheme from Plaintiff by telling him, in statements and other documents, that such fees are in accordance with the terms of their mortgage.

208. Thus, Plaintiff as a borrower was unjustly deprived of money and Defendant was unjustly enriched.

209. It would be inequitable and unconscionable for Ocwen to retain the profit, benefit and other compensation they obtained from their fraudulent, deceptive, and misleading conduct alleged herein.

210. Plaintiff seeks restitution from Ocwen, and seek an order of this Court disgorging all profits, benefits, and other compensation obtained by Ocwen from their wrongful conduct.

211. WHEREFORE, Plaintiffs request the Court order the Defendant Ocwen pay the Plaintiff compensatory damages in the sum of $1,500 for each separate demand, call, letter, and filed document which was recorded in the official records of this county, of no less than

52

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI 48823

517-889-2255, MZXRACER157@AOL.COM

100 separate events, in the sum of $1,500,000; compensatory damages for the emotional distress and trauma caused by their illicit conduct in the sum of three million dollars; and for an order striking from the official records of this County any and all documents where Ocwen has or had an interest as fraudulent and void as they split the note from the mortgage and are unsigned; and for exemplary damages of three times the amount, or nine million dollars for Violation of the MICHIGAN and Federal Fair Debt Collection Practices Act; for costs of suit, and such other and further relief as the court deems just and adequate.

## SIXTH CAUSE OF ACTION

Fraud

212. Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein.

213. Plaintiff reasonably expected that Ocwen would comply with the disclosures set forth in the mortgage agreement, Notes, Deeds of Trust, and as a result, Plaintiff relied on Ocwen's disclosures about the fees on their statements, reasonably believing the default-related service fees to be valid charges that were not marked-up.

53

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

214.    To lull Plaintiff into a sense of trust and dissuade them from challenging Ocwen's unlawful fee assessment, Ocwen concealed their scheme from Plaintiff by telling them, in statements and other documents, that such fees are in accordance with the terms of his mortgage agreement attached hereto.

215.    Had the true nature of the fees been disclosed to Plaintiff, he would have been aware of the mark-up, and Plaintiff would have disputed the charges and not paid them.

216.    As a result of Ocwen's fraudulent concealment, Plaintiff has been injured in fact and suffered a loss of money or property.

217.    Plaintiff would have challenged the assessment of such fees on their accounts had it not been for Ocwen's concealment of material facts.

218.    Ocwen concealed material facts, as discussed above, with knowledge of the effect of concealing of these material facts. Ocwen knew that by misleading Plaintiff (and other customers), they would generate higher profits.

219.    Plaintiff justifiably relied upon Ocwen's knowing, affirmative, and active concealment. By concealing material information about their scheme to assess marked-up default-related service fees on borrowers' accounts, Ocwen intended to induce Plaintiff into believing that they owed Ocwen money that it was not actually entitled to.

54

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

220. Ocwen acted with malice, oppression, or fraud.

221. Ocwen also acted with the intent to cause the Plaintiff financial harm.

222. As a direct and proximate result of Ocwen's omissions and active concealment of material facts, Plaintiff has been damaged in an amount according to proof at trial.

223. WHEREFORE, Plaintiffs request the Court order the Defendant Ocwen pay the Plaintiff compensatory damages in the sum of $1,500 for each separate demand, call, letter, and filed document which was recorded in the official records of this county, of no less than 100 separate events, in the sum of $1,500,000; compensatory damages for the emotional distress and trauma caused by their illicit conduct in the sum of three million dollars; and for an order striking from the official records of this County any and all documents where Ocwen has or had an interest as fraudulent and void as they split the note from the mortgage and are unsigned; and for exemplary damages of three times the amount, or nine million dollars for Violation of the MICHIGAN and Federal Fair Debt Collection Practices Act; for costs of suit, and such other and further relief as the court deems just and adequate.

## **SIXTH CAUSE OF ACTION**

Breach of Contract

55

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI   48823

517-889-2255, MZXRACER157@AOL.COM

224.   Plaintiff incorporates by reference in this cause of action each and every allegation of the preceding paragraphs, with the same force and effect as though fully set forth herein

225.   Ocwen assumed the obligations of Plaintiff's mortgage agreement (Exhibit C) which is attached hereto as Exhibit C and incorporated herein as though set forth in full when it took over the servicing of his loans.

226.   Plaintiff satisfied his obligations under the mortgage agreement by making timely payments of principal and interest.

227.   Ocwen is in breach of the attached mortgage contract Exhibit B by misapplying payments submitted by Plaintiff, placing such payments in suspense accounts without authorization by the mortgage agreements, and assessing late fees not authorized under the mortgage agreement (Exhibit D).

228.   Ocwen knew or should have known that misapplying timely payments was and continues to be a material breach of Plaintiff homeowners' mortgage agreements.

229.   Ocwen is in further breach of contract by treating Plaintiff as if they were in default due to the misapplied payments, when, in fact, Plaintiff were and are not delinquent under the mortgage agreement.

56

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING   MI  48823

517-889-2255, MZXRACER157@AOL.COM

230. That Plaintiff performed all obligations he was required to perform under the terms of that Mortgage Agreement, except those which the Plaintiff was prevented from performing by the wrongful acts of Ocwen.

231. As a proximate result of Ocwen's breaches, Plaintiff has suffered compensatory damages in an amount to be proven at trial.

232. WHEREFORE, Plaintiffs request the Court order the Defendant Ocwen pay the Plaintiff compensatory damages in the sum of $1,500,000; compensatory damages for the breach; and for an order striking from the official records of this County any and all mortgage documents as breached by Ocwen where Ocwen has or had an interest as loan servicer and breached that agreement on behalf of the current lender, whomever that may be; for attorney's fees, costs of suit, and such other and further relief as the court deems just and adequate.

## JURY DEMAND

Plaintiff demands a trial by jury.

## PRAYER FOR RELIEF

## FOR THE FIRST THROUGH FIFTH CAUSES OF ACTION –

57

MICHAEL J. KARMOL

601 ABBOT ROAD    EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

WHEREFORE, Plaintiffs request the Court order the Defendant Ocwen pay the Plaintiff compensatory damages in the sum of $1,500 for each separate demand, call, letter, and filed document which was recorded in the official records of this county, of no less than 100 separate events, in the sum of $1,500,000; compensatory damages for the emotional distress and trauma caused by their illicit conduct in the sum of three million dollars; and for an order striking from the official records of this County any and all documents where Ocwen has or had an interest as fraudulent and void as they split the note from the mortgage and are unsigned; and for exemplary damages of three times the amount, or nine million dollars for Violation of the MICHIGAN and Federal Fair Debt Collection Practices Act; for costs of suit, and such other and further relief as the court deems just and adequate.

## FOR THE SIXTH CAUSE OF ACTION -

Plaintiff requests the Court order the Defendant Ocwen pay the Plaintiff compensatory damages in the sum of $1,500,000; compensatory damages for the breach; and for an order striking from the official records of this County any and all mortgage documents as breached by Ocwen where Ocwen has or had an interest as loan servicer and breached that agreement on behalf of the current lender, whomever that may be; for attorney's fees, costs of suit, and such other and further relief as the court deems just and adequate.

58

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

**DECLARATORY RELIEF**

1.     Grant Judgment in favor of the Plaintiffs, and against the Defendants, finding that the Defendants' Recorded a mortgage dated April 22nd, 2004, L-3019, P-491, 2004-032000, recorded on May 20th, 2004, and the assignment of mortgage only, recorded on January 15th, 2016, in the Ingham County Michigan Register of Deeds, Document 2016-001754, are both void as the Defendant cannot separate the note from the mortgage, and in so doing, made the note and mortgage void and unenforceable, especially since the note has already been deemed satisfied and unenforceable by decree of the US bankruptcy Court.

2.     As a further result, the Plaintiff is entitled to a finding that the Defendant or any successor in interest is forever barred from seeking to enforce the same, and the note and mortgage , and assignment thereon, as well as all intended or actual attempts to sell the property at foreclosure must be stayed, set aside and/or vacated as fraudulently obtained without standing to do so.

3.     Grant Judgment against the Defendants declaring the Defendant GMAC MORTGAGE CORPORATION, Document Number 2004-032000, Liber 3109, Page 491, recorded in the official records of INGHAM MI (Exhibit B), be deemed null and void; cancelling the Mortgage of record; quieting title to the property owned by Plaintiff and against Defendant and all persons claiming under Defendants

59

MICHAEL J. KARMOL

601 ABBOT ROAD    EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

4.      Grant judgment on the complaint a finding that the Mortgage and note in favor of the
Defendant GMAC MORTGAGE CORPORATION, Document Number 2004-032000, Liber
3109, Page 491, and assignment of the mortgage only to OCWEN, recorded in the official
records of INGHAM MI (Exhibit B & C), are breached; are fraudulently obtained because the
Defendant knew that it was going to conceal the identity of the Lender when made; did conceal
the identity of the Lender after it was made; that the Defendant has been paid in full or the note
has been vacated by the Bankruptcy Court, and the mortgage was separated from the note by
means of the assigning, making that mortgage a nullity; and Exhibit B and C are therefore void,
satisfied, and therefore no longer enforceable; Grant Judgment finding quieting title to the
property in favor of the Plaintiffs, MICHAEL KARMOL and against OCWEN, and all others
claiming any interest therein, to the property located at the street address of 4531 DON STREET,
HOLT, MICHIGAN 48842 and further described as:

> **LOT 14, AND THE WEST ½ OF LOT 13, SPAHR SUBDIVISION NO. 1,
> TOWNSHIP OF DELHI, INGHAM COUNTY, MICHIGAN, ACCORDING TO
> THE RECORDED PLAT THEREOF, AS RECORDED IN LIBER 18 OF
> PLATS, PAGE 1, INGHAM COUNTY RECORDS.**

## TAX PARCEL NO: 3305-15-432-007  COMMON ADD: 4531 DON STREET

### HOLT, MICHIGAN 48842

1.      That the Court finds that as a result of all the allegations contained herein in this suit, the

60

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

notes secured by the mortgages, the mortgages and the assignments thereon all must be stricken as fraudulent and void ab initio.

2.      That Defendants, their subsidiaries, successors, transferees, assignees and their respective officers, directors, partners, agents, and employees, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or reviving the unlawful conduct alleged herein with respect to any product;

3.      That compensatory damages, restitution and all allowable damages be granted to Plaintiff regarding the FDCPA, Fraud, Unjust Enrichment and other violations alleged herein above, and in the event of default, one million dollars; and

4.      Grant the Plaintiff its costs according to a costs bill;

5.      Grant the Plaintiff its attorney's fees pursuant to a costs bill;

6.      Such other and further relief as the court deems just and adequate.

Respectfully submitted on this 2 6 day of SEPTEMBER 2016.

61

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255, MZXRACER157@AOL.COM

MICHAEL KARMOL

4531 DON STREET,

HOLT MICHIGAN 12550

TEL:

EMAIL:

## **VERIFICATION**

I declare under penalty of perjury that I have read the foregoing, and it is true and correct, except as to those matters which are based on information and belief, and as to those matters, I believe them to be true; and I executed this Verification on $SEPT$ ____ $26$ 2016.


Michael Karmol

MICHAEL KARMOL

4531 DON STREET, ~~HOLT MICHIGAN~~

HOLT MICHIGAN ~~12550~~ $4 8 8 42 \cdot 1107$

TEL: $517-742-7150$

62    $517- 889-2255$

MICHAEL J. KARMOL

601 ABBOT ROAD    EAST LANSING MI 48823

517-889-2255, MZXRACER157@AOL.COM

EMAIL:

63

MICHAEL J. KARMOL

601 ABBOT ROAD   EAST LANSING  MI  48823

517-889-2255. MZXRACER157@AOL.COM